**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ISHA R. KABBA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00738** |
| | ) | |
| **METROPOLITAN NASHVILLE HOSPITAL** | ) | **JUDGE CAMPBELL** |
| **AUTHORITY d/b/a NASHVILLE GENERAL** | ) | |
| **HOSPTIAL** | ) | **MAGISTRATE HOLMES** |
| | ) | |
| **Defendant.** | ) | **Jury Demand** |

**STATEMENT OF FACTS RESPONSE**

1. On November 5, 2018, Plaintiff Isha Kabba submitted an application for employment to the Hospital Authority through its online job portal, Jobvite. (Nov. 5, 2018 Job Application, Declaration of Diana Wohlfahrt "Wohlfahrt Decl." Ex. A; Wohlfahrt Decl. ¶5.) As indicated on the top of Kabba's application, she applied for a Patient Services Rep-Poolposition, job ID 2018.000641. (Id.)

   RESPONSE: Undisputed for purposes of this pleading.

2. There is no record of any other application for employment submitted by Kabbain 2018. (Wohlfahrt Decl. ¶ 7.)

   RESPONSE: Disputed as a litigation fact. Ms. Kabba testified that she applied-for and was interviewed-for a full-time PSR position. (Kabba Dep. pp. 35-36) (Kabba Decl. ¶ ). Ms. Kabba's testimony is part of the

litigation record and reflects her application for a full-time PSR position. (Id.)

3. On November 21, 2018, the Hospital Authority offered Kabba a position as a Patient Services Rep-Pool employee, which Plaintiff accepted by signing the offer letter on December 21, 2018. (Deposition of Plaintiff Isha R. Kabba ("Pl. Dep.") 31:19-32:9, 37:21-38:24; Offer Letter, Pl. Dep. Ex. 2.)

RESPONSE: Undisputed for purposes of this pleading.

4. Pool employees "[f]ill vacancies in the organization on special projects on a temporary basis," and "[d]o not automatically become regular full time employees." Pool employees are not guaranteed a certain amount of hours. Rather, the amount of hours a poolemployee works depends on the business needs at the time. Additionally, pool employees arenot civil service employees, thus, corrective action plans and progressive discipline are not mandatory. (Pool Employee Policy, Pl. Dep. Ex. 4.); (Wohlfahrt Decl. ¶¶ 10-11.)

RESPONSE: Undisputed as a statement of the Pool Employee Policy statement in the first sentence, but disputed as its relevancy to this litigation, *infra*. Disputed as to the second sentence's claim that the written corrective actions and progressive discipline polices are not mandatory for pool employees, as this is contrary to testimony from

human resources agents and the written policies plain language.

During the interview process, the record reflects that Metro General told Plaintiff that it did not have any PSR jobs available because people were moving around at the time but wanted to get her in the door. (Kabba Dep. pp. 35-36) (Kabba Decl ¶ ). During the interview process, Defendant informed Plaintiff she would initially be hired as a PSR-Pool and given full-time hours, then later transition to a PSR once there was a job opening. (Kabba Dep. pp. 35-36) (Kabba Decl ¶ ). With the agreement and understanding that Plaintiff would initially start as a PSR-Pool and transition once a job opening, Plaintiff accepted the job offer and started on December 24, 2018. (Kabba Dep. pp. 35-36). Plaintiff was not hired as a part-time or temporary employee, and Plaintiff averaged working full-time hours as a PSR-Pool as promised by Defendant during the interview process during her early employment period – from December 2018 through the second week of April 2019. (Exhibit 2, pp. 1-3) (Kabba Dep. pp. 35-36) (Kabba Decl ¶ ).

The PSR and PSR-Pool positions are subject to the same workplace polices and standards for conduct, attendance, and performance. (Exhibit 1) (Kabba Decl ¶ ). Pursuant to Defendant's written policies, the corrective action plans and progressive discipline plans apply to all employees and are mandatory. The difference is that civil service employees are entitled to hearing rights that are not afforded to non-civil service employees.

Civil service employees have added due process and hearing rights under its policies. (Exhibit 1, pp. 3-4). However, the Complaint, Disciplinary, and Grievance procedures detailed in its policies and all employee conduct, attendance, and performance policies as written expressly apply to "all employees." (Exhibit 1) (Norris Dep. p. 33). No provision of Defendant's policies state that the attendance, conduct, and progressive discipline policies are only mandatory for civil service employees. (Exhibit 1). The handbook expressly states that said policies apply to "all employees of the Hospital Authority." (Exhibit 1, pp. 5-7). Human Resources Director Tina Norris confirmed that the attendance and progressive discipline guidelines "are used to correct and provide effective, consistent, and fair standards to all employees." (Norris Dep. p. 33).

5. From approximately November 2018 until approximately May 2019, there wasno full-time Patient Services Rep position available and no full-time Patient Service Reps were hired. (Wohlfahrt Decl. ¶ 6.); (see also Pl. Dep. 37:6-20.)

RESPONSE: Disputed and disproven as a record fact.

The record reflects that there were open positions during this time-period. Plaintiff alleges that every time Metro General had an opening for a full-time PSR job during her employment, she applied and was turned down. (Kabba Dep. 36-37). During this period, Plaintiff was bypassed for two full-time PSR positions in April 2019. (Exhibit 11) (Exhibit 12). Kimberly Wilkerson secured a full-time PSR on

April 29, 2019. (Exhibit 11). Danielle Phillips secured a full-time PSR position on April 24, 2019. (Exhibit 12).

6.  Toward the beginning of Kabba's employment, the Patient Access Departmentwas understaffed because a few full-time employees were out on leave. By June 2019, the employees had returned to their regular, full-time employment, which resulted in less of a staffing need in the Patient Access Department. (Pl. Dep. 95:25-96:3); (Wohlfahrt Decl. ¶12.)

RESPONSE: Disputed and disproven as a record fact.

On June 2, 2019, Rolanda Stewart was transitioned from PSR-Pool to full-time PSR over Plaintiff. (Exhibit 31). On July 1, 2019, Yanita Howard was hired as a full-time PSR over Plaintiff. (Exhibit 32) (265). On July 24, 2019, Adrienne Trice was hired as a full-time PSR over Plaintiff. (Exhibit 33). Stewart, Howard, and Trice did not allege Title VII violations against Metro General. (Kabba Decl. ¶ ). Defendant cannot credibly claim that it was understaffed and had less staffing needs in the Patient Access Department when it continued to hire PSR staff between June and July 2019.

Also, in June 2019, a position was made available to Plaintiff contingent on her dropping the discrimination complaint against Leslie Fox. (Exhibit 25). In mid-June 2019, Leach and Plaintiff had another meeting about her discrimination complaints

5

against Fox. (Exhibit 24) (Exhibit 25) (Kabba Decl. ¶ ) Plaintiff asked to be hired for a full-time PSR position. (Kabba Decl. ¶  ) (Exhibit 24). Leach responded by offering Plaintiff a full-time PSR job if she dropped the case/investigation against Leslie Fox. (Exhibit 25) (Kabba Dep. p. 74-76). Leach told Plaintiff that Andrew Welker and Christine Crowley told her not to hire Plaintiff for a PSR position unless/until she dropped the discrimination complaint concerning Ms. Fox. (Id.) Plaintiff detailed this discussion in an email in response to concocted criticism targeted at her by Leach. (Exhibit 25). Leach told Plaintiff to "put the past in the past and move forward," adding that "the only way [Ms. Kabba] can become a full-time employee with benefits is if Leslie walks away from this and everyone starts with a clean slate." (Exhibit 25). Plaintiff turned down the offer. (Id.). Plaintiff said that "she wanted Leslie and HR to pay." Plaintiff told Leach that "[s]omeone had to answer for her complaint." (Exhibit 24).

7. Kabba alleges that in early March 2019, she overheard Leslie Fox, a Patient Access Team Lead, talking on her phone. Kabba says that she heard Fox say, "Black womenare lazy, fat, and only good for lying on their backs and making babies" and that she "only liked black men for their big dicks." Kabba alleges that she told Fox she would report her, to which Fox responded, "Go ahead. No one is going to believe a black girl like you." (Pl. Dep.49:24-50:8, 51:9-16.)

RESPONSE: Undisputed. After Plaintiff heard Leslie Fox make this statement in early March 2019, she went to her manager Andrew Welker and HR the next day. (Kabba Dep. p. 65, 130, 153-55).

6

8. Fox was the only individual at the Hospital Authority who Kabba says made any race-based comments toward or around Kabba during her employment. (Pl. Dep. 148:5-19.)

   RESPONSE: Undisputed for purposes of this pleading.

9. At all times relevant to Kabba's lawsuit, Fox was a full-time, Patient Access Team Lead. As a full-time employee, Fox is subject to the Civil Service Rules. (Pl. Dep. 49:15-19); (Wohlfahrt Decl. ¶ 13.)

   RESPONSE: Undisputed.

10. As a Team Lead, Fox is responsible for monitoring staff flow, coordinating work schedules, training of staff and assisting in monitoring daily work performance. (WohlfahrtDecl. ¶ 13.)

    RESPONSE: Undisputed for purposes of this motion.

11. On March 10, 2019, Kristen Watt submitted a written complaint about Ms. Kabba. Ms. Watt was another Patient Service Representative-Pool employee who worked directly with Ms. Kabba. Ms. Watt is African American. (Wohlfahrt Decl. ¶ 16, WohlfahrtDecl. Ex. D.); (Pl. Dep. 52:1-54:5.)

    RESPONSE: Undisputed for purposes of this motion. Ms. Kabba was not disciplined related to any issue with this complaint, thus the

purported complaint was unsubstantiated. (Kabba Dep. p. 184). There was no investigation into the incident and Defendant treated it as a very minuscule concern. (Kabba Dep. 184). Welker made no mention of Watt or anything related to her on April 9th when he terminated Ms. Kabba. (Exhibit 10).

12. On April 9, 2019, Kabba met with Andrew Welker, Patient Access Manager, and Charles Drewery, Welker met with Kabba to terminate her employment following a complaint he received from Fox regarding Kabba's workplace behavior. Kabba's employment, however, was not in fact terminated on this date. (Pl. Dep. 56:11-19, 59:9-60:4.)

RESPONSE: The first sentence is not disputed. The second sentence is irrefutably disputed by the record.

On April 9, 2019, Andrew Welker told Ms. Kabba to her face that she was fired. (Exhibit 10). Welker sent an email documenting his impressions of the April 9, 2019 meeting where he told Ms. Kabba she was fired. (Exhibit 10). Welker makes no mention of Watt or other issues with employees, and Welker said the termination was because Ms. Fox complained about Plaintiff being confrontational towards her during a workplace dispute. (Kabba Dep. pp. 57-60) (Exhibit 10). Plaintiff disputed the allegations and challenged her termination process as a dues-paying union member. (Exhibit 10) (Kabba Decl. ¶ ). At 7:30 p.m., Welker called Plaintiff and

told her that he "was going to uphold [his] decision to let [Plaintiff] go." (Exhibit 10).

13. On April 11, 2019, Kabba met with Welker, Drewery, and Steve Kennedy, Human Resources Director, where she told them about the comments that she overheard Fox make while on a phone call, as well as Fox's one comment to Kabba that "nobody willbelieve a black girl like you." (Pl. Dep. 59:4-10, 62:17-63:19.)
RESPONSE: Undisputed.

At the April 11th meeting, Plaintiff disputed Fox's allegations and told all attendees about her early-March discrimination complaints against Fox. (Kabba Dep. 61-62). She also discussed the disparity in Welker's handling of the cross-complaints. (Id.) Plaintiff spoke about how her complaints were not investigated and Fox was not disciplined, while she was fired by Welker immediately without discussion or investigation after receiving Fox's complaints against her. (Id.). Ms. Kabba said, "Well, you cannot fire me because I'm also paying my dues [union] … and I already complained about a situation that you're firing me for without even talking to me about the situation." (Id.) Plaintiff also mentioned the subsequent harassment that Fox had targeted her with since making the discrimination complaints. (Id. at 66-68).

14. Kennedy investigated Kabba's complaint and interviewed Fox. (Wohlfahrt Decl. ¶ 19.)

RESPONSE: Undisputed for purposes of this pleading.

Kennedy's investigation had multiple problems and polices were not followed appropriately. (Norris Dep. p. 85-88). The investigation was not timely or thorough. Norris Dep. p. 87). The investigative interviews did not address the specifics of the discrimination complaints. (Exhibit 23) (Norris Dep. p. 89). Specifically, interviewee-statements revealed that Ms. Fox: (a) "treats Isha wrong and that she is trying to go after her"; (b) "is an ass [and] harasses people"; and (c) "is a racist." (Exhibit 22) (Norris Dep. p. 89). Defendant still concluded that Plaintiff's discrimination complaints were "unsubstantiated." (Norris Dep. p. 83-84). Leslie Fox was not disciplined by Defendant and Metro General did not share its conclusions with Plaintiff in the following months – leaving her to believe her discrimination complaints were again ignored. (Kabba Dep. pp. 101-102; 153-54).

15. In May 2019, Kennedy resigned. The Human Resources Director position was filled by Tina Norris in June 2019. Diana Wohlfahrt, Chief Human Resources Officer, asked Norris to re-open the investigation. (Wohlfahrt Decl. ¶ 20.)

RESPONSE: Disputed to the suggestion that Tina Norris asked to re-

open the investigation voluntarily. Plaintiff and her union reps requested a re-investigation at the July 11th meeting, and Defendant admitted to the EEOC that: "Ms. Norris was present at the July 11 meeting when Ms. Kabba's union representatives requested that another investigation of the allegation be conducted. In an abundance of caution Ms. Norris agreed to investigate the allegation again." (MG 0433).

16. Norris reviewed the complaints Kabba brought in April 2019 and conducted an investigation. Sarah Smith, a Hospital Authority Hearing Officer with prior experience working with the Equal Employment Opportunity Commission, reviewed the information gathered from both investigations. The Union specifically requested Smith be used. (Wohlfahrt Decl. ¶ 20); (August 30, 2019 E-mail, Pl. Dep. Ex. 7.)

RESPONSE: Undisputed for purposes of this pleading, both Smith and Norris' review led them both to believe that Metro General's earlier investigation and conclusions were inadequate. (Norris Dep. pp. 85-88) (Exhibit 23).

17. The second investigation found Kabba's complaints to be unsubstantiated. (Wohlfahrt Decl. ¶ 21); (August 30, 2019 E-mail, Pl. Dep. Ex. 7.)

RESPONSE: Undisputed.

18. On June 27, 2019, Ms. Kabba applied for an open, full-time Patient Services Rep position. (June 27, 2019, Kabba Job Application, Wohlfahrt Decl. Ex. E; Wohlfahrt Decl. ¶ 17.) (Pl. Dep. 92:12-15.)

RESPONSE: Undisputed.

19. Ms. Kabba's June 27, 2019 application for the full-time Patient Services Rep position is the only job application the Hospital Authority has a record of that Ms. Kabba submitted in 2019. (Wohlfahrt Decl. ¶ 18.); (see also Pl. Dep. 196:7-22.)

RESPONSE: Disputed.

Plaintiff alleges that every time Metro General had an opening for a full-time PSR job during her employment, she applied and was turned down. (Kabba Dep. 36-37). That inherently includes the PSR positions given to Wilkerson, Philips, Howard, Trice, and Steward between April and July 2019. (Exhibits 11, 12, 31, 32, 33).

20. The Hiring Manager for the full-time Patient Services Rep position that Ms. Kabba applied for was Tasha Leach, Patient Access Manager, who was also Kabba's supervisor. Ms. Leach is African American. (Pl. Dep. 92:16-18.); (Wohlfahrt Decl. ¶ 17.)

RESPONSE: Undisputed.

21. Ms. Leach was not employed by the Hospital Authority when Kabba

first complained about Fox to Welker. (Pl. Dep. 73:3-5.); (Deposition of Tasha Leach, 30:12-19.)Leach had no knowledge of any facts regarding Kabba's complaint or the investigations intothe complaint, other than the fact that there was an investigation. (Leach Dep. 66:13-20.)

RESPONSE: Undisputed as to the first sentence. Disputed and disproven as to the second sentence.

Because Metro General promised to investigate but provided no follow-up or discussion, Plaintiff talked about Leach about her discrimination and retaliation complaints concerning Leslie Fox on May 7, 2019. (Exhibit 24) (Kabba Decl ¶ ). Leach did not want to hear about Plaintiff's complaints concerning Ms. Fox and maintained an antagonistic disposition during the discussion. (Exhibit 24) (Kabba Decl ¶ ). At the meeting Plaintiff told Leach about the details of the discrimination complaints, her worsening workplace treatment, her recent hours reductions, and being bypassed for full-time PSR jobs. (Exhibit 24) (Kabba Decl. ). Plaintiff asked Leach to hire her for a full-time PSR position. (Exhibit 24) (Kabba Decl. ). In mid-June 2019, Leach and Plaintiff had another meeting about her discrimination complaints against Fox. (Exhibit 24) (Kabba Decl.).

22. According to Leach, Kabba was a difficult employee from the time Leach started working there. (Leach Dep. 94:24-95:10.)

RESPONSE: Undisputed for purposes of this pleading. It appears Leach considered Plaintiff a difficult employee after her protected acts

and refusal to drop the discrimination complaint against Leslie Fox in exchange for a PSR job, which Leach was directed not to hire Plaintiff for unless she dropped said complaints against Fox by Welker [and Crowley]. (Exhibit 25).

23. Leach documented instances where she observed Kabba violating Hospital Authority policies. (Leach Dep. 11:25-12:5, 77:5-78:7, 97:11-98:14; Leach Notes on KabbaPerformance, Leach Dep. Ex. 12.)

   RESPONSE: Undisputed. The record does not reflect that Leach was chronicling the daily activities of similarly situated PSR staff or sending Human Resources negative messages about other employees who she supervised. (Kabba Decl. ¶ ) (Exhibit 24)

24. Leach spoke with Kabba regarding her tardiness and her staying on the clock longer than her scheduled shift. (Pl. Dep. 77:5-78:7).

   RESPONSE: Undisputed that Plaintiff was targeted with concocted criticisms and job scrutiny that other similarly situated employees were not targeted with by Leach, or openly permitted to perform without criticism. (Kabba Dep. pp. 169-171).

25. Kabba did in fact work past her scheduled shift on occasions. (Pl. Dep. 77:5-78:7).

   RESPONSE: Disputed as to the suggestion of being a problem. Plaintiff

was never disciplined for working past her scheduled time, and only worked past her scheduled shift when demanded to help patients, necessary to assist patients, or approved and authorized by management. (Kabba Dep. pp. 78-79).

26. On June 20, 2019, Leach asked Kabba to sign a copy of the Employee Use of Mobile Electric Devices Policy. (Pl. Dep. Ex. 5.) The policy states, in relevant part:

A. **Nashville General Hospital adopts the following guidelines for mobile phone usage (including sending and receiving text messages) during work time:**
   1. Personal mobile phones will not be used by staff for personal calls/texts except during authorized breaks.
   2. Personal mobile phone charger use is not allowed. Personal chargers should be confiscated until the end of the shift and returned to the employee.
   3. **Under no circumstances** should mobile phones be used while performing **direct patient care duties** or **performing non-patient care duties in a patient care area** such as: medication administration, performing procedures, performing laboratory testing, specimen collection, or performing hand-off communication to another provider.
   4. **Under no circumstances** should mobile phones be used while **performing other essential safety**

RESPONSE: Undisputed. However, no other employees were asked to sign this

form and others were allowed to openly use their cell phones by Leach at work. (Kabba Dep. pp. 90- 92, 149, 169-170). Only Plaintiff was targeted with presentation of this policy and enforcement of it in the workplace. (Kabba Dep. pp. 91-92, 149, 169-170).

27. After Kabba signed a copy of the Employee Use of Mobile Electronic

DevicesPolicy, Leach spoke with her about having her charger out and about having her phone out on numerous occasions. (Pl. Dep. 86:1-88:7.) Leach would tell her to "put her phone away"and that she "didn't want to see her phone out" when Kabba's phone was sitting on her desk. (Id.)

RESPONSE: Undisputed that Plaintiff was targeted with this form of disparate treatment. (Kabba Dep. pp. 91-92, 149, 169-170).

28. Leach spoke with Kabba about her registration numbers in comparison to other Patient Service Reps' registration numbers. Leach "would say sometimes ... 'Oh, youknow, you're not having – you don't have enough numbers for the month.'" (Pl. Dep. 81:8-21.)

RESPONSE: Disputed because Plaintiff's registration numbers were logically lower because she was working less than other PSR staff, yet getting criticized for her registration numbers by Leach to harass her by comparing her registration numbers to employees working 40-plus hours. (Kabba Dep. 81-82).

29. Two patients complained to the Hospital Authority about Kabba texting on herphone in their view. (Pl. Dep. 80: 21-24.); (Leach Notes on Kabba Performance, Leach Dep.Ex. 12.)

RESPONSE: Disputed. There is no record of a patient complaint against Plaintiff in the record. However, the record is replete with

concocted complaints against Plaintiff that she was compelled to rebut as false. (Exhibits 25, 15-20).

30. Leach told Kabba she was not eligible to be hired for the full-time Patient Services Rep position because of tardiness, performance, and behavior issues. (Pl. Dep. 103:12-16.)

RESPONSE: Disputed. Defendant's records reflect that Plaintiff was in good standing in terms of attendance and quality. (Exhibit 30). Plaintiff had no documented disciplinary history that would actually deem her ineligible and was never reprimanded or disciplined for performance, tardiness, or behavior issues pursuant to its written policies. (Kabba Dep. pp. 126, 185).

31. Adrienne Trice was hired for the full-time Patient Services Rep position that Kabba applied for. Trice is African American. (Pl. Dep. 93:4-10.)

RESPONSE: Undisputed and she received the position over Plaintiff.

32. There are no documented violations of the Hospital Authority's Employee Use of Mobile Electronic Devices Policy in Leslie Fox's file. (Wohlfahrt Decl. ¶ 15.) Likewise, no patient submitted a complaint to the Hospital Authority regarding Fox's use of her personal electronic device at the workplace. (Wohlfahrt Decl. ¶ 15.)

RESPONSE: Undisputed. However, Leslie Fox constantly violated the

17

parameters of this policy and the lack of documentation is indicative of disparate treatment between Fox and Plaintiff. (Kabba Dep. 91).

33. There are no documented time or attendance infractions in Fox's file during the time Kabba was employed by the Hospital Authority. (Wohlfhart Decl. ¶ 15.)

RESPONSE: Undisputed. However, Leslie Fox time records reflect that she was late and worked-over during her employment.

34. On September 3, 2019, Leach confiscated Kabba's cell phone charger, which was sitting on Kabba's desk, and Kabba told Leach "I'm not leaving without my charger." (Pl. Dep. 107:19-108:5); (Wohlfahrt Decl. Ex. F, pp. 2-4.)

RESPONSE: Disputed. The cited portions of the record do not reflect this contention. Plaintiff testified to her belief that the charger was "inside of my purse, sitting on my desk" and stated "Ms. Leach took my charger from my purse. My charger was never on my desk." (Kabba Dep. pp.82, 108).

35. Nicole Brown, Human Resources Business Partner, gathered statements from Christine Crowley, Senior Director, Revenue Cycle Systems, Leach, Laura Cantrell, PatientAccess Team Lead, and Kabba, all of whom were present during the September 3, 2019 incident where

Kabba's charger was confiscated and the subsequent events. (Witness Statements from Sept. 3, 2019 Incident, Wohlfahrt Decl. Ex. F; Wohlfahrt Decl. ¶ 24.)

RESPONSE: Disputed as a flagrant misrepresentation of Defendant's conduct that intentionally evades detrimental facts. Metro General received several written statements from other purported witnesses – including receiving signed-and-dated written statements from Officers Blackmon and Motley on September 16, 2019 [which it conveniently omits] as part of its investigation. (Exhibit 46). Defendant's investigation continued through September 16, 2019. (Id.)

36. Wohlfahrt and Norris considered the Employee Use of Mobile Electronic Devices Policy and the witness statements. Norris and Wohlfahrt made the decision to terminate Kabba's employment effective September 6, 2019. (Wohlfahrt Decl. ¶ 27.); (Termination Letter, Pl. Dep. Ex. 9.)

RESPONSE: Disputed. There is no record of Ms. Wohlfahrt being involved in Plaintiff's termination at all as a decisionmaker. The September 10, 2019 notification of termination email was delivered solely by Tina Norris, and Diana Wohlfahrt is not copied on the email. (Exhibit 44). Attached to the notification of termination email attached a termination letter. (Exhibit 45). The termination letter copies Tina Norris and is signed by Tasha Leach. (Exhibit 45). Diana Wohlfahrt is

not copied on the termination letter or termination email, and she is not reflected as a decisionmaker in any record documents. (Id.). Norris and Leach are clearly the decisionmakers. (Id.). Additionally, Defendant plays semantics by stating that the termination was "effective September 6, 2019," rather than "decided September 6, 2019" – because it was not. Plaintiff was terminated September 10, 2019 and the record only reflect that the decision was made on September 10th. (Exhibit 44 and 45). The termination letter is backdated and was not delivered on September 6th. (Exhibit 45). September 6th correspondence between Norris and Leach makes no mention that Plaintiff has been terminated. (Exhibit 41).

37. Norris e-mailed Kabba on September 10, 2019 at 1:26 PM. The e-mail notifiedKabba that her employment was terminated effective September 6, 2019. (Deposition of TinaNorris, Ex. 11.)

RESPONSE: Undisputed.

38. Kabba filed her petition for order of protection on September 9, 2019, which was denied on the same day. (Public Records of Case No. 19OP2402 attached hereto as Exhibit A, at pp. 9-10.) Proof of service indicates that the petition was not personally served on Norris until September 10, 2019 at 2:31 pm. (Id.)

RESPONSE: Disputed as to the suggestion and semantics of

"personally served on," rather than "informed about" the police report of September 9th. However, this fact ignores the police documents reflecting that Defendant was informed about Plaintiff's September 9, 2019 police report on the morning of September 10, 2019.

On September 9, 2019, Plaintiff filed another police report against Norris. (Exhibit 42). Nashville Police Department documents in the record reflect that an officer (Officer Gomes) arrived at Metro General at 10:33 a.m. and completed service of information about the September 9th report [identified by incident #] at 11:57 a.m. (Exhibits 42 and 43). The Citizen's Information Notice reflects Officer Gomes' arrival at Metro General concerning the September 9th complaint around 10:50 a.m. (Exhibit 42).

39. At the time the decision to terminate Kabba's employment was made, Wohlfahrt had no knowledge of any police report or petition for order of protection filed by Kabba against Norris. (Wohlfahrt Decl. ¶ 24.)
RESPONSE: Undisputed for purposes of this motion.

40. Kabba's pool employee position was not filled following the termination of her employment. (Wohlfahrt Decl. ¶ 29.)
RESPONSE: Disputed. Plaintiff testified that she was replaced. (Kabba 145-146). Records indicate that Jasmine Johnson started as member of the PSR staff on September 19, 2019 (Kabba 000232).

21

/s/ Brian C. Winfrey

Brian Winfrey, TN Bar No. 02576
MORGAN & MORGAN
810 Broadway, Suite 105
Nashville, Tennessee 37203
(615) 601-1276
bwinfrey@forthepeople.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a copy of the foregoing statement of facts response was electronically mailed to the Attorneys for Defendant, Allison L. Bussell and Mallory S. Ricci, this the 12th day of January 2022.

/s/ Brian C. Winfrey
Brian C. Winfrey