**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ISHA R. KABBA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00738** |
| | ) | |
| **METROPOLITAN NASHVILLE HOSPITAL** | ) | **JUDGE CAMPBELL** |
| **AUTHORITY d/b/a NASHVILLE GENERAL** | ) | |
| **HOSPTIAL** | ) | **MAGISTRATE HOLMES** |
| | ) | |
| **Defendant.** | ) | **Jury Demand** |

## ADDITIONAL MATERIAL FACTS

Plaintiff Isha Kabba ("Plaintiff" or "Ms. Kabba") submits the following statement of material facts as to which there is no genuine dispute for trial, pursuant to Federal Rule of Civil Procedure 56(c)(1) and Local Rule of Court 56.01(b).

1. Ms. Kabba applied for a full-time Patient Service Rep ("PSR") with Metro General, in addition to applying for a Patient Services Rep-Pool (PSR-Pool) job. (Kabba Dep. pp. 35-36) (Kabba Decl. ¶ 3-5).

   RESPONSE:


2. The PSR and PSR-Pool jobs are in the same department, report to the same supervisors, and have the same job duties and qualifications – with key differences are that PSR's are afforded full-benefits, guaranteed-hours, and civil service hearing rights. (Kabba Decl ¶ 4) (Exhibit 1).

   RESPONSE:

3.  The PSR and PSR-Pool positions are subject to the same workplace polices and standards for conduct, attendance, and performance. (Exhibit 1) (Kabba Decl ¶ 4).

    RESPONSE:

4.  Ms. Kabba interviewed for a full-time PSR position. (Kabba Dep. pp. 35-36) (Kabba Decl. ¶ 5).

    RESPONSE:

5.  During the interview process, Metro General told Ms. Kabba that it did not have any PSR jobs available because people were moving around at the time but wanted to get her in the door. (Kabba Dep. pp. 36) (Kabba Decl. ¶ 6).

    RESPONSE:

6.  During the interview process, Defendant informed Plaintiff she would initially be hired as a PSR-Pool and given full-time hours, then later transition to a PSR once there was a job opening.  (Kabba Dep. pp. 35-36) (Kabba Decl. ¶ 6).

    RESPONSE:

7.  With the agreement and understanding that Plaintiff would initially start as a PSR-Pool and transition once a job opening, Plaintiff accepted the job offer and started on December 24, 2018. (Kabba Dep. pp. 35-36) (Kabba Decl. ¶ 8).

    RESPONSE:

8. Plaintiff averaged working full-time hours as a PSR-Pool during her early employment period – from December 2018 through the second week of April 2019. (Exhibit 2) (Kabba Decl. ¶ 9).

RESPONSE:

9. Plaintiff's first week was in late-December 2018, where she worked multiple 10.5-hour shifts (totaling 63 hours). (Exhibit 2).

RESPONSE:

10. In January 2019, Plaintiff worked 174.5 hours (averaging 43.625 hours per week). (Exhibit 2)

RESPONSE:

11. In the short month of February 2019, Plaintiff worked 143.5 hours. (Exhibit 2).

RESPONSE:

12. In March 2019, Plaintiff worked 201.25 hours (averaging 50.31 hours per week). (Exhibit 2).

RESPONSE:

13. The first week of April, Plaintiff worked 52 hours. (Exhibit 2).

RESPONSE:

14. Plaintiff averaged weekly net earnings of $682.46 between December 2019 and the 2nd week of April 2019. (Exhibit 2) (Exhibit 3) (Kabba Decl ¶ 9).

RESPONSE:


15. Andrew Welker worked as a Patient Access Manager and other management roles for Metro General. (Kabba Decl ¶ 10).

RESPONSE:


16. Mr. Welker was Plaintiff's direct supervisor for most of her early employment period. (Kabba Decl ¶ 10)

RESPONSE:


17. Mr. Welker and Ms. Kabba had an amazing working relationship. (Kabba Dep. p. 187) (Kabba Decl. ¶11).

RESPONSE:


18. The two often communicated cordially in text messages, emails, and in-person. (Exhibit 4) (Exhibit 5) (Kabba Decl ¶ 11).

RESPONSE:

19. They often discussed the availability of PSR positions and the prospect of transitioning Plaintiff to full-time PSR, and Welker was receptive to transitioning Plaintiff to PSR in her early employment. (Exhibit 4) (Exhibit 5) (Kabba 187) (Kabba Decl. ¶ 11).

RESPONSE:

20. In March 2019, Welker told Plaintiff that: (1) he would inquire about open PSR jobs on her behalf; and (2) her PSR-Pool role "could soon evolve" into a full-time PSR position. (Exhibits 4 and 5).

    RESPONSE:


21. Mr. Welker only provided Plaintiff positive performance feedback as her supervisor. (Kabba Decl ¶ 12).

    RESPONSE:


22. Welker never communicated that Plaintiff was ineligible for a full-time PSR job. (Kabba Decl ¶ 12) (Exhibits 4 and 5).

    RESPONSE:


23. Mr. Welker never issued Plaintiff a single disciplinary action for attendance, conduct, or performance issues under the policies detailed in Defendant's General's Employee Handbook. (Kabba Decl ¶ 13).

    RESPONSE:


24. Metro General has an Employee Handbook that details its attendance, performance, and conduct standards. (Exhibit 1) (Norris Dep. pp. 17-33).

    RESPONSE:

25. Defendant's employee handbook includes a detailed progressive discipline system. (Exhibit 1, pp. 5-7) (Norris Dep. pp. 32-33).

RESPONSE:


26. Although civil service employees are entitled to hearing rights for employment issues, the aforementioned-policies and standards are mandatory and apply for all employees regardless of civil service status. (Exhibit 1) (Norris Dep. p. 33).

RESPONSE:


27. No provision of Defendant's policies state that the attendance, conduct, and progressive discipline policies are only mandatory for civil service employees. (Exhibit 1).

RESPONSE:


28. Civil service employees have added due process and hearing rights, but the employee standards and policies expressly apply to "all employees." (Exhibit 1) (Norris Dep. p. 33).

RESPONSE:


29. The handbook expressly states that said policies apply to "all employees of the Hospital Authority," and includes a section for added rights afforded to civil service employees. (Exhibit 1) (Norris Dep. p. 33).

RESPONSE:

30. When reviewing the Conduct, Disciplinary and Grievance procedures, Human Resources Director Tina Norris confirmed in testimony that the attendance and progressive discipline guidelines "are used to correct and provide effective, consistent, and fair standards to all employees." (Exhibit 1) (Norris Dep. p. 33).

RESPONSE:


31. The progressive discipline policy operates on a points-based system that calculates "occurrences" over a rolling twelve-month period. (Exhibit 1, pp. 5-7) (Norris Dep. pp. 32-44). Pursuant to this policy, Defendant must progressively discuss and document disciplinary actions on its "Verbal/Written Counseling Form." (Id.) (Norris pp. 36-44).

RESPONSE:


32. Concerning absences, the policy defines an "occurrence of absence" as an absence of time equal to or exceeding one half of the assigned shift. (Exhibit 1, pp. 5-7)

RESPONSE:


33. Concerning incidents of tardiness, three incidents of tardiness greater than seven (7) minutes are counted as an "occurrence of absence." (Exhibit, pp. 5-7) (Norris Dep. p. 34).

RESPONSE:


34. For employees during the six-month probationary period, four (4) documented occurrences [12 acts of tardiness] can result in termination. (Exhibit 1, p. 6).

RESPONSE:

35. An employee beyond the six-month probationary period is not subject to termination for attendance issues until they reach twelve (12) documented occurrences [36 incidents of tardies, 12 unscheduled absences, or a combination of both]. (Exhibit 1, p. 6).

RESPONSE:


36. Supervisors told Plaintiff that she was subject to its occurrence-based system during her employment. (Exhibit 19) (Kabba Decl. ¶ 14).

RESPONSE:


37. During her entire employment, Plaintiff was not issued a single Verbal/Written Counseling reprimand. (Kabba Decl. ¶ 15).

RESPONSE:


38. Plaintiff had no documented disciplinary history pursuant to the terms of its written policies that would deem her ineligible for a PSR position at any point of her employment. (Id.).

RESPONSE:


39. Leslie Fox worked as a Team Lead in the Patient Access Department. (Kabba Decl. ¶ 16).

RESPONSE:

40. Ms. Fox and Ms. Kabba both worked under the supervision of Mr. Welker. (Kabba Decl. ¶ 17).

RESPONSE:


41. Fox and Welker are both White (Caucasian). (Kabba Decl. 18).

RESPONSE:


42. Plaintiff and the overwhelming majority of PSR staff are Black (African-American). (Kabba Decl. ¶ 19).

RESPONSE:


43. Plaintiff had a good relationship with Leslie Fox during her early employment period. (Kabba Dep. p. 187) (Kabba Decl. ¶ ).

RESPONSE:


44. In early-March 2019, Ms. Kabba heard Leslie Fox make racist remarks about black women on a workplace telephone call. (Kabba Dep. 49) (Kabba Decl. ¶ 21).

RESPONSE:


45. Ms. Fox was heard saying, "Black women are lazy, fat, and only good for lying on their backs and making babies." Fox added that she "only liked black men for their big d__ks." (Kabba Dep. pp. 49-50) (Kabba Decl. ¶ 21).

RESPONSE:

46. Plaintiff was offended Ms. Fox's racist remarks. She approached Fox and told her that she was going to make a discrimination complaint about the remarks. (Kabba Decl. 21) (Kabba Dep. p. 51).

RESPONSE:

47. Ms. Fox curtly responded, "Go ahead. No one is going to believe a black girl like you." (Kabba Dep. p. 51) (Kabba Decl. ¶ 21).

RESPONSE:

48. Plaintiff made a discrimination complaint to Welker and Human Resources the next day. (Kabba Dep. p. 65) (Kabba Decl. ¶ 22).

RESPONSE:

49. Plaintiff also spoke about Fox's racist statements with multiple coworkers. (Kabba Dep. pp. 66-68) (Kabba Decl. ¶ 22).

RESPONSE:

50. Fox found out that Plaintiff complained and was speaking about her racist statements to coworkers in March 2019. (Kabba Decl. ¶24) (ECF 1, ¶ 21) (Kabba Dep. pp. 66-68, 72).

RESPONSE:

51. On March 19, 2019, Fox delivered Welker an unsolicited email disparaging Plaintiff and recommending that "Isha should not be offered a full-time position." (Exhibit 8) (Kabba Decl. ¶ 24)

RESPONSE:


52. On March 29, 2019, Fox delivered another unsolicited email to Welker disparaging Plaintiff and alleging insubordination during an alleged verbal altercation – which Plaintiff disputes. (Exhibit 9) (Kabba Decl. ¶ 25).

RESPONSE:


53. Fox's March 29th email identified that the complaint was after being informed by Plaintiff that she was "going to HR tomorrow to file a complaint". (Exhibit 9) (Kabba Dec. ¶ 26).

RESPONSE:


54. When Welker received Plaintiff's discrimination complaint in early-March, he told Plaintiff that her discrimination complaint would be promptly investigated. (Kabba Dep. 136) (Kabba Decl. ¶ 23).

RESPONSE:


55. Plaintiff's complaint was not investigated in March 2019 and no disciplinary action against Fox was taken. (Kabba Dep. 136) (Kabba Decl. 23).

RESPONSE:

56. Welker responded to receiving Ms. Fox's late-March complaints against Plaintiff by telling Ms. Kabba she was terminated. (Kabba Dep. 56-59) (Exhibit 17).

RESPONSE:


57. On April 9, 2019, Andrew Welker told Ms. Kabba to her face that she was fired. (Exhibit 10) (Kabba Decl. ¶ 28-30).

RESPONSE:


58. Welker sent an email documenting his impressions of the April 9, 2019 meeting where he told Ms. Kabba she was fired. (Exhibit 10).

RESPONSE:


59. At the April 9th meeting, Welker said the termination was because Ms. Fox complained about Plaintiff being confrontational towards her during a workplace dispute. (Kabba Dep. pp. 57-60) (Kabba Decl. ¶¶ 28-30).

RESPONSE:


60. At the April 9th meeting, Welker did not mention tardiness or a situation involving Kristin Watt as the reason for termination, only saying that the termination was a result of Fox's complaints of her being confrontation. (Kabba Dep. pp. 57-58) (Exhibit 10) (Kabba Decl. ¶ 28).

RESPONSE:

61. Plaintiff disputed the allegations and challenged her termination process as a dues-paying union member. (Exhibit 10) (Kabba Decl. ¶ 29).

RESPONSE:


62. At 7:30 p.m. on April 9th., Welker called Plaintiff and told her that he "was going to uphold [his] decision to let [Plaintiff] go." (Exhibit 10) (Kabba Decl. ¶ 30).

RESPONSE:


63. Plaintiff contacted her union representative after speaking to Welker. (Kabba Decl. ¶ 30).

RESPONSE:


64. On April 11, 2019, a meeting was held to address Plaintiff's termination and her challenges. (Kabba Dep. pp. 60 – 68).

RESPONSE:


65. The April 11th meeting was attended by Plaintiff, her union rep, and multiple members of management and human resources. (Kabba Dep. p. 60)

RESPONSE:


66. At the April 11th meeting, Plaintiff disputed Fox's allegations and told all attendees about her early-March discrimination complaints against Fox. (Kabba Dep. pp. 61-62) (Kabba Decl. ¶¶ 32 – 34)

RESPONSE:

67. At the April 11th meeting, Plaintiff discussed the disparity in Welker's handling of the cross-complaints -- speaking about how her complaints were not and Fox was not disciplined, while Welker responded to receiving Fox's complaints by terminating her immediately without discussion or investigation. (Kabba Dep. p. 62) (Kabba Decl. ¶¶ 32-34)

RESPONSE:

68. At the April 11th meeting, Ms. Kabba said, "Well, you cannot fire me because I'm also paying my dues [union] … and I already complained about a situation that you're firing me for without even talking to me about the situation." (Kabba Dep. p. 62) (Kabba Decl. ¶ 32-34).

RESPONSE:

69. At the April 11th meeting, Plaintiff also told attendees about the subsequent harassment that Fox had targeted her with since making the discrimination complaints – including complaining to Welker in the first place. (Kabba Dep. pp. 65, 66-68) (Kabba Decl. ¶ 32-34).

RESPONSE:

70. Ms. Kabba's challenge to the termination resulted Metro General rescinding the termination. (Kabba Decl. ¶ 34).

RESPONSE:

71. Fox's allegations were unsubstantiated and did not result in discipline to Plaintiff. (Kabba Decl. ¶ 34).

RESPONSE:


72. Plaintiff continued her employment with a clean personnel file free from documented disciplinary action, and eligible for a full-time PSR position under Defendant's workplace policies after the April 11th meeting. (Kabba Decl. ¶ 34).

RESPONSE:


73. After March and April 2019 discrimination complaints, Metro General did not respond to rescinding the termination by fulfilling its initial-promise to promote Plaintiff to full-time PSR. (Kabba Decl. ¶ 34).

RESPONSE:


74. Time records show a stark reduction to Plaintiff's workhours starting the second week of April 2019. (Exhibit 2).

RESPONSE:


75. From the second week of April through May 18, 2019, Plaintiff's average weekly net earnings dropped from $682.46 to $494.63. (Exhibit 3).

RESPONSE:

76. Plaintiff alleges that every time Metro General had an opening for a full-time PSR job during her employment, she applied and was turned down. (Kabba Dep. 36-37) (Kabba Decl. ¶ 35-37).

RESPONSE:


77. Plaintiff was bypassed for two full-time PSR positions in April 2019. (Exhibit 11) (Exhibit 12).

RESPONSE:


78. Kimberly Wilkerson secured a full-time PSR on April 29, 2019. (Exhibit 11) (Kabba Decl. ¶ 37)

RESPONSE:


79. Danielle Phillips secured a full-time PSR position on April 24, 2019. (Exhibit 12). (Kabba Decl. ¶ 37)

RESPONSE:


80. There is no record that Phillips and Wilkerson complained to Metro General about Title VII violations. (Kabba Decl. ¶ 37).

RESPONSE:

81. Welker and Fox responded by targeting Plaintiff with hostile and harassing workplace treatment. (Kabba Decl. ¶¶ 38-40)

RESPONSE:


82. The harassment and hostility happened on a regular basis and continued for the remainder of Plaintiff's employment. (Id.)

RESPONSE:


83. In March 2019, Leslie Fox (1) sent Welker unsolicited complaints to concerning Plaintiff and asking Welker to take adverse action against Plaintiff. (Exhibits 8 and 9)

RESPONSE:


84. After Plaintiff complained Leslie Fox began: gossiping and making false statements about Plaintiff to coworkers, including falsely alleging that she would show up to work drunk and reeking of alcohol; speaking to Plaintiff in hostile and aggressive tones during workplace interactions; (4) subjecting Plaintiff to disparate job scrutiny, including nitpicking of performance and time monitoring; and performing overt acts harassment, including hovering over Plaintiff at her desk while she worked. (Kabba Decl. ¶ 39) (Kabba Dep.).

RESPONSE:

85. Plaintiff testified that Ms. Fox began to make her life at work "a living hell." (Kabba p. 76-77).

RESPONSE:


86. After Plaintiff complained Welker responded to Plaintiff by: dismissing her discrimination complaints in March and failing to conduct a prompt investigation; terminating her on April 9, 2019, while taking no action against a Caucasian comparator under his supervision [Leslie Fox]; immediately reducing her work hours; bypassing Plaintiff for full-time PSR positions; yelling at Plaintiff in front of coworkers; speaking to her in hostile and condescending tones; subjecting her disparate job scrutiny, concocting criticisms, and sending negative statements about Plaintiff to Human Resources long after he stopped serving as her direct supervisor; and (8) directing later-Patient Services Manager Tasha Leach not to hire Plaintiff for a full-time PSR position unless she dropped the complaint/investigation against Leslie Fox, *infra*. (Kabba Decl. ¶40) (Exhibit 37 and 38). (Exhibit 28) (Exhibit 41-45) (Ex. 47).

RESPONSE:


87. Metro General also responded by performing an inadequate investigation of the discrimination complaints and ignoring substantiating information in its conclusions. (Exhibit 23) (Norris Dep. pp. 85-88).

RESPONSE:

88. At the April 11th meeting, Defendant represented that it would conduct a competent investigation of her discrimination complaints against Fox. (Kabba Dep. 70-72).

RESPONSE:


89. An investigation was conducted led by then-Human Resources Director Steve Kennedy. (Kabba Dep. 70-71) (Wohlfahrt Decl. ¶ 19).

RESPONSE:


90. The Kennedy-led investigation had multiple problems and polices were not followed appropriately. (Norris 87) ("leadership did not, at times, follow the policies appropriately." (Exhibit 23) (Norris Dep. pp. 85-88). (Exhibits 21-23).

RESPONSE:


91. The investigation was neither timely nor thorough. (Norris Dep. pp. 85-88). (Exhibit 21-23).

RESPONSE:


92. The investigative interviews did not address the specifics of the discrimination complaints. (Exhibits 21-23) (Norris Dep. p. 88-89)

RESPONSE:

93. Interviewee-statements revealed that Ms. Fox: (a) "treats Isha wrong and that she is trying to go after her"; (b) "is an ass [and] harasses people"; and (c) "is a racist." (Exhibit 22) (Exhibits 21-23) (Norris Dep. p. 89).

RESPONSE:

94. Despite having this information, Metro General concluded that Plaintiff's discrimination complaints were "unsubstantiated." (Exhibit 21)

RESPONSE:

95. Leslie Fox was not disciplined or reprimanded. (Kabba Decl. ¶ 54).

RESPONSE:

96. The inadequacy of this investigation is not disputed and acknowledged by multiple persons, including later-Human Resources Director Tina Norris. (Exhibit 23) (Norris Dep. p. 86-87)

RESPONSE:

97. Metro General did not interview Plaintiff or discuss its conclusions with her in the following months – leaving Plaintiff to believe her discrimination complaints were ignored by Defendant again. (Kabba Dep. p. 71-72) (Kabba Decl. ¶ 43)

RESPONSE:

98. By May 2019, Tasha Leach had become Plaintiff's direct supervisor and Patient Access Manager. (Kabba Decl. ¶ 41).

RESPONSE:


99. Andrew Welker remained a manager agent and included on personnel correspondence concerning Ms. Kabba after he ceased being her direct supervisor around May 2019. He remained active in her work scheduling and human resources concerns through the end of Plaintiff's employment – which is reflected in an abundance of emails and correspondence concerning Ms. Kabba. (Exhibits 15-20) (Kabba Decl. ¶ 42).

RESPONSE:


100. Because Metro General promised to investigate but provided no follow-up or discussion, Plaintiff talked about Leach about her discrimination and retaliation complaints concerning Leslie Fox on May 7, 2019. (Exhibit 24) (Kabba Decl ¶ 43-44) (Kabba Dep. 130, 137-38, 153-54).

RESPONSE:


101. Leach did not want to hear about Plaintiff's complaints concerning Ms. Fox and maintained an antagonistic disposition during the discussion. (Exhibit 24) (Kabba Decl ¶ 43)

RESPONSE:

102. At the meeting Plaintiff told Leach about the details of the discrimination complaints, her worsening workplace treatment, her recent hours reductions, and being bypassed for full-time PSR jobs. (Kabba Decl.¶ 43) (Exhibit 24)

RESPONSE:


103. Plaintiff asked Leach to hire her for a full-time PSR position. (Exhibit 24) (Kabba Decl. ¶ 43).

RESPONSE:


104. In mid-June 2019, Leach and Plaintiff had another meeting about her discrimination complaints against Fox. (Exhibit 24) (Kabba Decl. ¶ 45) (Exhibit 25)

RESPONSE:


105. Again, Plaintiff asked to be hired for a full-time PSR position. (Kabba Decl. ¶ 45) (Exhibit 24-25)

RESPONSE:


106. Leach responded by offering Plaintiff a full-time PSR job if she dropped the case/investigation against Leslie Fox. (Exhibit 25) (Kabba Decl. ¶ 45)

RESPONSE:

107. Leach told Plaintiff that Andrew Welker and Christine Crowley told her not to hire Plaintiff for a PSR position unless/until she dropped the discrimination complaint concerning Ms. Fox. (Kabba Decl. ¶ 45) (Exhibit 25)

RESPONSE:

108. Plaintiff detailed this discussion in an email in response to concocted criticism targeted at her by Leach. (Exhibit 25).

RESPONSE:

109. Leach told Plaintiff to "put the past in the past and move forward," adding that "the only way [Ms. Kabba] can become a full-time employee with benefits is if Leslie walks away from this and everyone starts with a clean slate." (Exhibit 25) (Kabba Decl. ¶ 45)

RESPONSE:

110. Plaintiff turned down the offer. Plaintiff said that "she wanted Leslie and HR to pay." Plaintiff told Leach that "[s]omeone had to answer for her complaint." (Exhibit 25) (Kabba Decl. ¶ 45).

RESPONSE:

111. Also in June, Plaintiff notified Defendant that she would soon file an EEOC Charge for discrimination and retaliation based on Metro General's continued conduct towards her. (ECF 1) (Kabba Decl. ¶ 46).

RESPONSE:

112. On July 4, 2019, Union Rep Trista Boseman told Defendant that the union was pursuing a class action grievance – which included alleged Title VII violations related to Ms. Kabba's ongoing issues. (Exhibit 26).

RESPONSE:

113. On July 11, 2019, Plaintiff and her Union Rep met with multiple agents of Metro General management and Human Resources. (Kabba Dep. pp. 98 – 103) (Kabba Decl. ¶ 47).

RESPONSE:

114. At the meeting, Ms. Kabba discussed her belief that her discrimination complaints were being ignored; the recent retaliatory acts she had suffered; and requested that Defendant investigate her discrimination and retaliation complaints. (Kabba Dep. 100-102) (Kabba Decl.¶ 47)

RESPONSE:

115. Then-HR Director Tina Norris agreed to conduct another investigation at the July 11th meeting on Plaintiff's request. (Kabba Decl. ¶ 47).

RESPONSE:

116. On July 19, 2019, the EEOC processed Plaintiff's discrimination and retaliation charge and notified Defendant of the same. (Exhibit 27) (Kabba Dep. p. 132) (Kabba Decl. ¶ 48).

RESPONSE:

117. On July 26, 2019, Plaintiff's Union Rep raised another complaint of discrimination and retaliation to Defendant after Plaintiff was targeted with additional retaliatory acts – including a further reduction of workhours. (Exhibit 28)

RESPONSE:


118. The July 26th complaint reads in pertinent part: "Isha Kabba is still not being offered to work available hours in her department. However, Leslie Fox and other FT team members are … Ms. Kabba has had her PRN hours cut down to only being on the schedule for one week … These ongoing actions continue to be discriminatory and an act of retaliation." (Exhibit 28)

RESPONSE:


119. After the May - July 2019 protected acts started, Metro General further reduced Plaintiff hours and earnings. (Exhibit 2-3) (Kabba Decl. ¶ 49).

RESPONSE:


120. From May 2019 through the end of her employment, Plaintiff's hours were reduced to the point where her average weekly net earnings plummeted from $682.46 in early employment, to $ 494.63 over the next month-and-a-half, to just $323.70 per week for the remainder of her employment. (Exhibit 3)

RESPONSE:

121. A low point was reached after Plaintiff's June and July 11th protected acts, when she earned just $107.73 for the July 14 – July 27th pay period. (Exhibit 3).

RESPONSE:


122. The July 14-27th hours-reduction was followed by an additional complaint of discrimination and retaliation on July 26, 2019 from Plaintiff's Union Representative. (Exhibit 28).

RESPONSE:


123. In response, Diana Wohlfahrt instructed Leach and Welker to "make sure she is on the schedule" and receiving consistent hours "until the investigation is complete" because the recent hours-reduction "could appear as retaliatory because she has been working regularly [30+ hours or more] before meeting with us." (Exhibit 29).

RESPONSE:


124. Also, Metro General continued to bypass Plaintiff for full-time PSR positions. (Kabba Decl. ¶ 50) (Exhibits 31-33).

RESPONSE:


125. July investigation notes of Defendant reflects that Plaintiff was in "good standing in attendance [and] quality." (Exhibit 30).

RESPONSE:

126. Plaintiff was not hired as a full-time PSR after performing her additional protected acts. (Kabba Decl. ¶ 50-51).

RESPONSE:


127. On June 2, 2019, Rolanda Stewart was transitioned from PSR-Pool to full-time PSR over Plaintiff. (Exhibit 31) (Kabba Decl. ¶ 50).

RESPONSE:


128. On July 1, 2019, Yanita Howard was hired as a full-time PSR over Plaintiff. (Exhibit 32) (Kabba Decl. ¶ 50).

RESPONSE:


129. On July 24, 2019, Adrienne Trice was hired as a full-time PSR over Plaintiff. (Exhibit 33) (Kabba Decl. ¶ 50).

RESPONSE:


130. Stewart, Howard, and Trice did not allege Title VII violations against Metro General. (Kabba Decl. ¶ 50).

RESPONSE:


131. The reason Defendant refused to hire Plaintiff for a full-time PSR position was stated by Tasha Leach in mid-June when she: (1) said that Andrew Welker and Christine Crowley told her not to hire Plaintiff for a full-time position unless she drops the case/investigation

against Leslie Fox; and (2) offered Plaintiff a full-time PSR position with benefits if she dropped the complaints against Leslie Fox. (Kabba Decl. ¶51)

RESPONSE:

132. Patient Access Manager Tasha Leach [with Andrew Welker] targeted Plaintiff with hostile, harassing, and disparate treatment for the remainder of her employment, including: (1) repeated reductions to her workhours; frequent exclusions from emails and text messages concerning overtime and vacant shifts; repeated refusals-to-hire for PSR positions because she would not "move forward" and drop the complaint against Fox; hostile treatment and condescending tones during workplace interactions; concocted criticisms about performance and time clock issues that Plaintiff was forced to rebut as false; disparate enforcements of cell-phone and other workplace policies that were not being enforced against similarly-situated employees; disparate job scrutiny, surveillance, and documentation of Plaintiff's workplace activities. (Kabba Dep. 88-90) (Kabba Decl. ¶ 52)

RESPONSE:

133. The record does not reflect that Leach was chronicling the daily activities of similarly situated PSR staff or sending Human Resources negative messages about other employees who she supervised.  (Exhibit 24) (Kabba Decl. ¶ 52).

RESPONSE:

134. Metro General performed another inadequate investigation that ignored substantiating information in its findings and conclusions. (Kabba Decl. ¶ 53-54).

RESPONSE:


135. As part of this investigation, Metro General: (1) conducted interviews of staff and personnel; and (2) reviewed the earlier investigation file, which included the statements affirming that Fox "treats Isha wrong and that she is trying to go after her," "is an ass [and] harasses people"; and "is a racist." (Norris Dep. p. 97)

RESPONSE:


136. Norris received an additional race-based complaint against Ms. Fox by Andrew Welker on behalf of Tasha Leach on July 3, 2019. (Exhibit 55) (Norris Dep. pp. 99-103)

RESPONSE:


137. Ms. Leach confirmed the veracity of Welker's complaint during subsequent conversations, but Norris chose not to consider Welker/Leach's complaint as substantiating information in her conclusions for the Kabba complaint. (Norris Dep. p.103) (Leach Dep. pp. 13-24)

RESPONSE:


138. On August 30, 2019, Norris emailed Plaintiff that her discrimination and harassment complaints against Fox were "unsubstantiated." (Exhibit 35).

RESPONSE:

139. Fox was not disciplined or reprimanded at all by Metro General. (Kabba Decl. ¶ 54)

RESPONSE:


140. In August 2019, Tina Norris instructed Tasha Leach, Andrew Welker, and Christine Crowley to keep detailed notes on Ms. Kabba until the investigation concluded. (Exhibit). Norris stated that once the investigation is over, "then we [will] make a decision at that time on the next steps with Isha." (Exhibit 36).

RESPONSE:


141. On September 3, 2019, Ms. Kabba arrived to work at the start of her scheduled shift. (Kabba Decl. ¶ 55) (Exhibit 37)

RESPONSE:


142. Around 10:00 a.m., Plaintiff left her workstation to use the restroom. (Kabba Decl.¶ 55) (Exhibit 37)

RESPONSE:


143. After Plaintiff left her workstation, Tasha Leach and Christine Crowley went to Plaintiff's workspace while she was away from the desk. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:

144. Leach and Crowley started touching things around Plaintiff's desk area and going through her personal property, including her purse. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:


145. Leach and Crowley did not peruse the workstation or personal property of other PRS staff. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:


146. While in the restroom, Plaintiff was contacted via cell phone by a coworker who urged her to come back "because Tasha is snooping on [Plaintiff's] desk and fidgeting in her personal property." (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:


147. Plaintiff discovered that her cell phone charger was confiscated from her purse or behind her desk by Leach and/or Crowley. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:


148. Plaintiff promptly approached Ms. Leach. Plaintiff asked Leach to return her property. Leach refused. Leach told Plaintiff that her charger would not be returned until the end of her shift. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:

149. Plaintiff then contacted her Union Rep for advice and went to Human Resources to write a statement about the morning events. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:

150. After going to Human Resources, Plaintiff again approached Ms. Leach and asked for her cell phone charger. Ms. Leach raised her voice, laughed in Plaintiff's face, and refused to return the property again. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:

151. Ms. Kabba then called the police to come to the facility. An officer arrived at the facility and took her statement about 30-45 minutes later. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:

152. Metro General agents became angry at Plaintiff for calling the police to the facility. HR agents Tina Norris and Nicole Brown confronted Plaintiff at work. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:

153. Ms. Norris raised her voice at Plaintiff, pointed her finger in her face, and told her to pack up her belongings. Plaintiff was then escorted by two security guards to Norris' office. Ms. Norris was heated during the office discussion. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:

154. Upset, Tina Norris threw her cell phone in an overhand fashion at Plaintiff – hitting Ms. Kabba with the phone. (Kabba Decl.¶ 55-63) (Exhibit 37) (Kabba Dep. 114-15)

RESPONSE:


155. Hitting someone with a thrown cell phone is a form of assault and is unlawful under Tennessee law. (Norris Dep. p. 51)

RESPONSE:


156. After suffering the workplace assault, Plaintiff was escorted off the premises. (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:


157. She immediately went to a nearby medical facility because she was experiencing severe anxiety and panic attacks. (Kabba Dep. p. 117-118) (Kabba Decl.¶ 55-63) (Exhibit 37)

RESPONSE:


158. Plaintiff filed a police report against Norris for assault on September 3, 2019. (Exhibit 38) (Kabba Decl. ¶ 62)

RESPONSE:


159. On September 3, 2019, Tina Norris sent Plaintiff an email at 5:31 p.m. (Exhibit 39) (Kabba Decl. ¶ 62)

RESPONSE:

160. The email makes no representation that Plaintiff was fired for the work events. (Exhibit 39) (Kabba Decl. ¶ 62).

RESPONSE:


161. In fact, Norris stated that Plaintiff was only escorted from the premises to "allow for a thorough investigation to take place and emotions to subside." Norris wrote that Plaintiff would remain an employee and "paid for any missed scheduled time during the investigation process." (Exhibit 39) (Kabba Decl. ¶ 62).

RESPONSE:


162. Between September 3rd and September 16th, Metro General gathered written statements as part of its investigative activities. (Exhibit 40)

RESPONSE:


163. Plaintiff provided a written statement on September 5, 2019. (Exhibit 37) (Kabba Decl. ¶ 63-70)

RESPONSE:


164. Metro General received several written statements from other purported witnesses – including signed-and-dated statements from Officer Blackmon and Captain Motley on September 16, 2019. (Exhibit 40, 46) (Kabba Decl. ¶ 63-70)

RESPONSE:

165. On September 6, 2019, Leach and Norris discussed their awareness of receiving Plaintiff's September 3rd police – including Leach's confirmation of the police report number. (Exhibit 41) (Kabba Decl. ¶ 63-70)

RESPONSE:


166. In the correspondence between Leach and Norris, neither makes a claim that: (1) its investigation has been completed; (2) conclusions about the investigation have been reached; or (3) a decision to terminate Plaintiff was made on or before September 6th. (Exhibit 41) (Kabba Decl. ¶ 63-70)

RESPONSE:


167. On September 9, 2019, Plaintiff filed another police report concerning the September 3rd incident. (Exhibit 42) (Kabba Decl. ¶ 63-70)

RESPONSE:


168. Documents reflect that Metro General was made aware of the September 9th report on September 10th at 10:50 a.m. and/or 11:57 a.m. (Exhibit 42 and 43) (Kabba Decl. ¶ 63-70)

RESPONSE:


169. On September 10, 2019, Norris sent Plaintiff an email notifying her that she is fired. (Exhibit 45) (Kabba Decl. ¶ 63-70)

RESPONSE:

170. Prior to this point, Plaintiff had not been told that she was fired or delivered a termination letter. (Kabba Decl. ¶ 67) (Exhibit 44) (Kabba Decl. ¶ 63-70)

RESPONSE:

171. The September 10th email expressly states that: "This email is to provide notice that your employment with Nashville General Hospital [is] terminated…" (Exhibit 44) (Kabba Decl. ¶ 63-70)

RESPONSE:

172. Defendant told Plaintiff that she was fired on September 10, 2019, and includes a letter to the September 10th email that attached a termination letter dated for September 6th stating the termination was "effective September 6, 2019." (Exhibit 45) (Kabba Decl. ¶ 63-70)

RESPONSE:

173. Two reasons are identified as the reasons for termination: (1) violation of the Employee Use of Mobile Electronic Devices policy; and (2) alleged unprofessional behavior during the September 3rd dispute. (Exhibit 45) (Kabba Decl. ¶ 63-70)

RESPONSE:

174. No claims of poor performance are stated as grounds for termination on the letter. (Exhibit 45) (Kabba Decl. ¶ 63-70)

RESPONSE:

175. The email and termination letter were sent by Tina Norris. (Exhibit 44) (Kabba Decl. ¶ 63-70)

    RESPONSE:


176. The termination letter was signed by Tasha Leach. (Exhibit 45)

    RESPONSE:


177. Diana Wohlfahrt is not identified as a decision-maker or copied on September 10th email, the termination letter, any of the investigative communications concerning Ms. Kabba. (Exhibits 44 and 45) (Kabba Decl. ¶ 69).

    RESPONSE:


178. On September 16, 2019, Metro General received signed-and-dated statements from Officer Blackmon and Captain Motley regarding the events of September 3, 2019. (Exhibit 46)

    RESPONSE:


Respectfully submitted,

/s/ Brian C. Winfrey
BRIAN C. WINFREY #02576
Morgan & Morgan/The Winfrey Firm
810 Broadway, Ste. 105
Nashville, TN 37203
615-601-1276
bwinfrey@forthepeople.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a copy of the STATEMENT OF ADDITIONAL FACTS was electronically mailed to the Attorneys for Defendant, Allison L. Bussell and Mallory S. Ricci, this the 12h day of January 2022.

/s/ Brian C. Winfrey
Brian C. Winfrey